**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

---

MARIA JOSE FLORES DIAZ,

        Petitioner,

    v.                                    No. 2:26-cv-00639-KWR-JHR

MARKWAYNE MULLIN, *Secretary of the U.S.*
*Department of Homeland Security*,
TODD BLANCHE, *Acting Attorney General of the United States*,
MARY DE ANDA-YBARRA, *Field Office Director of the*
*El Paso Field Office of U.S. Immigration and Customs Enforcement,*
*Enforcement and Removal Operations*,
DORA CASTRO, *Warden of the Otero County Processing Center,*
*in their official capacities*,

        Respondents.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Petitioner Maria Jose Flores Diaz's Petition

for Writ of Habeas Corpus (Doc. 1) and Motion for Temporary Restraining Order (Doc. 5). This

Petition requires the Court to determine the meaning of "custody" as used in 8 U.S.C.

§ 1182(d)(5)(A). Under § 1182(d)(5)(A), the noncitizen "shall forthwith return or be returned to

the custody from which he was paroled and thereafter his case shall continue to be dealt with in

the same manner as that of any other applicant for admission to the United States." Courts have

determined "custody" to mean physical detention, restraints on liberty, and legal status. Based on

the Court's reading of the plain text and consideration of relevant persuasive authority, the Court

finds that, regardless of whether "custody" refers to physical detention or restraints on liberty, the

term "custody" includes the accompanying legal status—the statutory authority—that authorized

the initial custody from which the noncitizen was paroled. Thus, once a petitioner's parole terminates, she returns to the legal status held at the time she was paroled.

Therefore, having considered the Petition, exhibits, and the relevant law, the Court finds that the Petition and request for temporary restraining order are not well-taken, and therefore, are **DENIED**.

## BACKGROUND

On December 13, 2022, Petitioner, a citizen of Ecuador, entered the United States "without being inspected, admitted or paroled by an Immigration Officer." Doc. 1-3 at 9 (Form I-213). That same day, Petitioner was arrested near Calexico, California, and she was transported to El Centro Sector Centralized Processing Center for further processing. *Id.* She claims that she was inspected, placed in section 240 removal proceedings, and paroled into the United States with a Form I-94 pursuant to 8 U.S.C. § 1182(d)(5)(A). Doc. 1 ¶¶ 46, 57 (Petition); Doc. 1-3 at 9. Her initial parole status expired on February 12, 2023. *See* Doc. 1-3 at 31. Petitioner filed an asylum application on December 4, 2023. *Id.* at 16 (Form I-589).

On November 14, 2025, Department of Homeland Security ("DHS") detained Petitioner at a check-in in Newark, New Jersey. Doc. 1-3 at 9–10. DHS processed Petitioner and issued her a Notice to Appear. *Id.* at 2 (Notice to Appear). The Notice to Appear alleges that Petitioner was not "admitted or paroled after inspection by an Immigration Officer." *Id.* Petitioner was transferred to Otero County Processing Center in Chaparral, New Mexico. *Id.* at 53 (Detainee Locator).

On March 13, 2026, the Court ordered Respondents to submit briefing by March 26, 2026. Doc. 7 (Order for Briefing). On March 26, 2026, Respondents filed their Response (Doc. 10). Petitioner replied on March 27, 2026. Doc. 11. The Court, upon noticing discrepancies between

2

the alleged and documented parole expiration dates, ordered supplemental briefing. Doc. 12. The parties provided clarification and relevant documentation on April 30, 2026. Doc. 13; Doc. 14.

## LEGAL STANDARD

The Constitution guarantees that the writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const. art. I, § 9, cl. 2). A federal court may grant a writ of habeas corpus to a petitioner who demonstrates that he is in custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3). A challenge to immigration detention is "properly brought directly through habeas." *Soberanes v. Comfort*, 388 F.3d 1305, 1310 (10th Cir. 2004) (citing *Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001)).

## DISCUSSION

Petitioner was paroled from custody authorized by § 1225(b) as an arriving alien. This Petition turns on whether the expiration of parole granted under § 1182(d)(5)(A) returns Petitioner to the custody, including legal status, from which she was paroled. Based on the plain text and various forms of persuasive authority, the Court finds that Petitioner returns to the custody, including the accompanying legal status authorizing such custody, from which she was paroled.[1]

I.   **Petitioner is detained pursuant to § 1225 given the expiration of her parole.**

Petitioner contends that § 1225(b) mandatory detention "no longer applies" and she is now detained pursuant to § 1226(a) because she was paroled into the United States under

---

[1] The Court's finding aligns with the findings of the other courts in this district that have considered this issue. *See Fuenmayor v. Mullin*, --- F. Supp. 3d ---, No. 1:26-cv-00622-MIS-LF, 2026 WL 963297, at *1 (D.N.M Apr. 9, 2026) (Strickland, J.); *Borisov v. Castro*, No. 2:25-cv-01315-JB-GJF, 2026 WL 926278, at *17 (D.N.M. Apr. 6, 2026) (Fouratt, Mag. J.); *Mendibaev v. Lyons*, No. 1:25-cv-01308-DHU-GBW, 2026 WL 917457, at *4 (D.N.M. Apr. 4, 2026) (Urias, J.); *Valera-Marin v. Lyons*, No. 2:25-cv-00914-KG-GBW, 2025 WL 3687978 (D.N.M. Dec. 19, 2025) (Gonzales, J.).

§ 1182(d)(5)(A). *See* Doc. 1 ¶¶ 43, 46. Respondents take the position that upon their discretionary decision to revoke a petitioner's parole granted under § 1182(d)(5)(A), the petitioner is returned to the "status she had when she first arrived seeking admission." Doc. 10 at 6. Neither party disputes that Petitioner was detained pursuant to § 1225(b) before she was paroled into the United States. *See* Doc. 1 ¶ 46 (arguing that because of the years of parole, "mandatory detention under § 1225(b) no longer applies"); Doc. 10 at 7 ("The custody from which Petitioner was paroled was mandatory detention per INS § 1225, so that is the custody to which she must be returned upon her parole's cancellation."). Additionally, Petitioner's parole was not affirmatively revoked, but rather her parole expired in 2023. *See* Doc. 13-1; Doc. 14 at 2. Given the Court's reading of the text of § 1182(d)(5)(A), application of the entry fiction doctrine, and fundamental separation of powers principles in the field of immigration, the Court finds that the expiration of § 1182(d)(5)(A) parole requires Petitioner to return to the custody, including legal status, from which she was paroled.

**A. The plain text of § 1182(d)(5)(A) requires a return to the custody, including the accompanying legal status, from which a petitioner was paroled.**

Petitioner holds the position that her parole into the United States and her resulting time living in the community moves her into the statutory framework of § 1226(a) because parole renders her "already present in the United States." Doc. 1 ¶ 43. Respondents argue that the text of § 1182(d)(5)(A) states that "the alien shall forthwith return or be returned to the custody from which [s]he was paroled," and here, the custody from which she was paroled was mandatory detention. Doc. 10 at 7. For several reasons, the Court agrees.

Section 1182(d)(5)(A) provides the following:

The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded

as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

When interpreting a statute, a court must first "examine the statute's plain text" and "[a]bsent ambiguity, [the] analysis ends there." *United States v. Koerber*, 10 F.4th 1083, 1112 (10th Cir. 2021). The ambiguity of statutory language is determined by the "language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Berberich v. Kan. City S. Ry. Co.*, 162 F.4th 1045, 1053 (10th Cir. 2025) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *see also Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1381 (10th Cir. 2009) ("We also take into account the 'broader context of the statute as a whole' when ascertaining the meaning of a particular provision." (citation omitted)). Courts also consider traditional canons of statutory interpretation. *Conrad*, 585 F.3d at 1381; *Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1062 (10th Cir. 2011). Generally, the courts consider non-textual evidence bearing on Congress's intent or purpose, such as legislative history, only if the statutory language is ambiguous. *See, e.g.*, *United States v. Husted*, 545 F.3d 1240, 1247 (10th Cir. 2008) ("[I]t is a longstanding principle that absent ambiguity we cannot rely on legislative history to interpret a statute.").

### 1.  The word "custody" includes the legal status authorizing such custody.

The Court begins with the word "custody" as used within the phrase, "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." § 1182(d)(5)(A). As used in § 1182(d)(5)(A), "custody" is not statutorily defined. The Court must give "all undefined terms their ordinary meaning." *Nat'l Credit Union Admin. Bd. v. Nomura Home*

*Equity Loan, Inc.*, 764 F.3d 1199, 1227 (10th Cir. 2014); *see also Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011) ("Because the statute does not define 'report,' we look first to the word's ordinary meaning."). "Custody" means "[t]he care and control of a thing or person for inspection, preservation, or security." *Custody*, *Black's Law Dictionary* (12th ed. 2024). The "proper inquiry focuses on the ordinary meaning of the [term] at the time Congress enacted it." *Nat'l Credit Union*, 764 F.3d at 1227 (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 184 (2004)). The Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. 104-208, 110 Stat. 3009 (1996) ("IIRIRA") was enacted on September 30, 1996. At the point of enactment, "custody" meant "[t]he care and control of a thing or person. . . . Also the detainer of a man's person by virtue of lawful process or authority," and the definition explained that "[t]he term is very elastic and may mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or of taking manual possession." *Custody*, *Black's Law Dictionary* (6th ed. 1990).

As used here, "custody" has been interpreted to include legal status, *see Fuenmayor*, 2026 WL 963297, at *3, to only mean physical "immigration detention," *Coal. for Humane Immigrant Rights v. Noem*, 805 F. Supp. 3d 48, 85 (D.D.C. 2025), and to mean restraints on liberty, not physical detention, *see Qasemi v. Francis*, No. 25-cv-10029-LJL, 2025 WL 3654098, at *10–11 (S.D.N.Y. Dec. 17, 2025). Regardless of whether "custody" here refers to physical detention or the mere power to detain, the definition of "custody" indicates that legal status must be included. The definition of "custody," at the time of enactment, stated that detention must be done "by virtue of lawful process or authority." *Custody*, *Black's Law Dictionary* (6th ed. 1990). "Control" refers to the "[p]ower or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee." *Control*, *Black's Law Dictionary* (6th ed. 1990); *see also Control*, *Black's Law*

*Dictionary* (12th ed. 2024) (defining control as "[t]o exercise power or influence over," or "[t]o regulate or govern"). "Power," in this sense, refers to "[t]he legal right or authorization to act or not act." *Power*, *Black's Law Dictionary* (12th ed. 2024); *see also Power*, *Black's Law Dictionary* (6th ed. 1990) ("The right, ability, authority, or faculty of doing something. Authority to do any act which the grantor might himself lawfully perform."). Even if "custody," as used in § 1182(d)(5)(A), does not mean physical detention and only means a restraint on one's liberty, such a restraint requires legal authorization to control or exercise power over another. Such legal authority indicates that legal status is implied regardless of whether "custody" means physical detention or a restraint on liberty. Thus, the definition of "custody" may not directly indicate whether "custody," as used in § 1182(d)(5)(A), refers only to physical detention or non-physical restrains on liberty, but surrounding context strongly suggests that one's legal status is implicated under either interpretation.

### 2. The surrounding context indicates that "custody" includes legal status.

Given that the definition of "custody" may not be dispositive, the Court turns to consider the specific context in which "custody" is used as well as the broader context of the statute as a whole. *See Dekovic v. Rubio*, 169 F.4th 1002, 1013–14 (10th Cir. 2026). The surrounding context indicates that "custody," as used here, includes legal status.

The phrase "shall forthwith return or be returned" demonstrates that the return to "custody" means that a noncitizen returns to their initial custody status, including the legal status authorizing such custody. The word "shall is mandatory." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Text* 112 (2012); *see also Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("[T]he word 'shall' is ordinarily 'the language of command.'"). "Forthwith" means "immediately, at once, without delay or interval." *Forthwith*, Oxford English Dictionary,

7

https://www.oed.com/dictionary/forthwith_adv?tab=meaning_and_use#3838180 (last visited May 26, 2026); *see also Forthwith*, *Black's Law Dictionary* (6th ed. 1990) (defining "forthwith" as "Immediately; without delay; directly; within a reasonable time under the circumstances of the case; promptly and with reasonable dispatch"). And "return" means "[t]o revert, go back again, to (also into) a previous condition or state." *Return*, Oxford English Dictionary, https://www.oed.com/dictionary/return_v1?tab=meaning_and_use#25490360 (last visited May 26, 2026). The plain language of the phrase "shall forthwith return or be returned" demonstrates that, upon revocation of parole, the noncitizen must immediately revert to a previous condition or state. A previous condition or state, such as detention, must stem from some lawful authority. *See Custody*, *Black's Law Dictionary* (6th ed. 1990). Thus, regardless of whether "custody" means detention, legal restraints on liberty, or legal status, the mandatory reversion to a previous state or condition suggests a reversion to some past legal authority or status that form the basis for physical custody or general restraints on liberty.

The phrase "from which he was paroled" follows the word "custody." § 1182(d)(5)(A). A plain reading of the phrase "from which he was paroled" suggests that the noncitizen returns to the "custody" she was in at the time of her release on parole. If Congress only meant "physical custody" it would have used the term "physical custody" or "detention." *See Qasemi*, 2025 WL 3654098, at *10 ("When 'custody' is intended to denote detention, it is preceded by the modifier 'physical,' or 'in.'"). Regardless, if Congress meant only "physical custody" or "detention," such a reading should not exclude the accompanying legal status authorizing such custody because "custody" when referring to "detention" must be done "by virtue of lawful process or authority." *Custody*, *Black's Law Dictionary* (6th ed. 1990). Thus, under either interpretation, the return to the

custody from which Petitioner was paroled includes the legal authority or status that authorized the custody.

The phrase "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States," § 1182(d)(5)(A), does not mean that the return to "custody" excludes the original legal status of the noncitizen. The phrase specifies that the noncitizen's "case shall continue" to be dealt with as would the case of "any other applicant for admission." Several other district courts have found that the phrase means that the noncitizen will continue to be treated "as an 'applicant for admission,' because his parole itself did not constitute an admission," *Coal. for Humane Immigrant Rights*, 805 F. Supp. 3d at 85, and that the noncitizen be "treated like the vast majority of undocumented immigrants currently living in this country who are not subjected to expedited removal," *Qasemi*, 2025 WL 3654098, at *11 (quoting *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 302 (E.D.N.Y. 2025)). These courts have found that § 1182(d)(5)(A) does not require a noncitizen to be detained under the same statutory status as his original detention and that "continu[ing]" to deal with the noncitizen's case "in the same manner as that of any other applicant for admission" results in § 1226(a) detention because the noncitizen was in the country during parole. *See Rafibaev v. Noem*, No. 26-cv-00461-PAB, 2026 WL 607559, at *4–5 (D. Colo. Mar. 4, 2026); *Qasemi*, 2025 WL 3654098, at *12. However, some noncitizens are paroled into the United States and others enter without being paroled.

The Court agrees that a noncitizen whose parole expires continues to be an "applicant for admission," but that reading does not prohibit a reversion to the legal status from which the noncitizen was paroled. Rather, this clause is properly read as an instruction to treat the noncitizen's case as any other "applicant for admission" who is not released on parole. A noncitizen parolee is at all times an "applicant for admission" because she "has not been admitted." *See* 8

U.S.C. § 1225(a)(1) ("An alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission."). Further, parole is "not regarded as an admission" under § 1182(d)(5)(A). The Supreme Court has recognized that a parolee is in the "custody" of the parole board, even if she is not subject to "actual, physical custody." *Jones v. Cunningham*, 371 U.S. 236, 239–40 (1963). Thus, a parolee remains an "applicant for admission" who possesses a special parole custody status under § 1182(d)(5)(A), and after parole ends, her case is dealt with as any other applicant for admission who is not paroled.

*Coalition for Humane Immigrant Rights* concludes that § 1182(d)(5)(A) calls for a noncitizen to be "physically brought back into immigration detention ("custody") and then legally continues to be treated as an 'applicant for admission.'" 805 F. Supp. 3d at 85. This conclusion does not hold for two reasons: (1) the section does not use the term "physical custody" or "detention," and (2) characterizing the legal status as only referring to a noncitizen's status as an "applicant for admission" is inconsistent with the definition of "status."

The plain text does not state "physical custody." *See* § 1182(d)(5)(A). If the statute intended to confine "custody" to mean "physical custody" it would have used the word "physical," used the phrase "in custody," or used the word "detention." *See Qasemi*, 2025 WL 3654098, at *10 ("When 'custody' is intended to denote detention, it is preceded by the modifier 'physical,' or 'in.'"). The "custody" at issue is not preceded by the words "physical" or "in." *See* § 1182(d)(5)(A). Thus, it appears to be more plausible that "custody" refers to general restraints on one's liberty. *See Qasemi*, 2025 WL 364098, at *11 ("Here, reading Section 1182(d)(5)(A) to require return to the custody of the DHS rather than mandatory physical detention resolves any theoretical

surplusage."). However, under either interpretation, the statutory status of the noncitizen should be understood to be included in the term "custody."

"Custody" means "[t]he care and control of a thing or person for inspection, preservation, or security." *Custody*, *Black's Law Dictionary* (12th ed. 2024). Such a notion of "custody" indicates that the noncitizen should return to the "care and control" from which they were released on parole. "Control" means "[t]o exercise power or influence over," or "[t]o regulate or govern." *Control*, *Black's Law Dictionary* (12th ed. 2024). *Coalition for Humane Immigrant Rights* concludes that this means physical control or detention. *See* 805 F. Supp. 3d at 85. *Qasemi* concludes that "custody" does not mandate a return to physical custody.[2] 2025 WL 3654098, at *11. Under either interpretation, the ordinary understanding of "custody" and "control" indicate that the statute, or legal status, that authorized the initial "custody" must be included in the "return." Control over another is not derived arbitrarily and generally arises from some form of statutory authority. *See Zadvydas*, 533 U.S. at 688 (noting that a jurisdiction-stripping provision "does not deprive an alien of the right to rely on 28 U.S.C. § 2241 to challenge detention that is without statutory authority"); *see also* 18 U.S.C. § 4001 ("No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress."). The following examples for the word "control" reflect this understanding: (1) "the judge controlled the proceedings," and (2) "by law, the budget office controls expenditures." *Control*, *Black's Law Dictionary* (12th ed. 2024). These examples indicate that one should understand "control," especially as it relates to custody, as stemming from

---

[2] *Qasemi* also has the concern that interpreting "custody" to require the return to § 1225, if the noncitizen was paroled from § 1225, would render § 1225(b)(1)(A)(iii)(II) surplusage because the section "expressly exempts from the ambit of the mandatory detention scheme one who has been paroled." *Id.* Not necessarily so. Even if § 1225(b)(1)(A)(iii)(II) exempts those who have been paroled, § 1225(b)(2) may still provide coverage under the mandatory "custody," authorized by § 1225, from which a noncitizen was paroled.

some statutory authority. Therefore, both interpretations are incomplete without the inclusion of the original legal status or authority authorizing the initial custody, whether it be physical or "mere power." *See Custody*, *Black's Law Dictionary* (6th ed. 1990).

*Coalition for Humane Immigrant Rights* reasons that "custody" only means physical custody, and "a parolee has the legal status of 'applicant for admission' before being paroled, during their parole, and after their parole ends." 805 F. Supp. 3d at 86. This interpretation shortchanges the very idea of "status." "Status" refers to a "person's legal condition, whether personal or proprietary; the sum total of a person's legal rights, duties, liabilities, and other legal relations, or any particular group of them separately considered." *Status*, *Black's Law Dictionary* (12th ed. 2024). Section 1182(d)(5)(A) gives no indication that the noncitizen's status should be confined to an "applicant for admission" and that the "sum total" of her legal status be ignored. A noncitizen can be an "applicant for admission" and detainee under § 1225. Even the "separately considered" concept of "status" refers to a "particular group" of legal rights, such as the legal rights of a noncitizen. Therefore, the more likely interpretation is that "custody"—be it physical or metaphysical liberty restraints—includes the statute authorizing such custody, and the phrase "shall continue to be dealt with in the same manner as . . . any other applicant for admission" should be construed as requiring the same treatment as "any other applicant for admission" *who is not paroled*.

Accordingly, under both interpretations of "custody," physical custody or restraints on liberty, the Court finds that § 1182(d)(5)(A) strongly suggests that the "return" to the "custody, from which he was paroled" includes the prior legal status that authorized such custody.

12

**B. The persuasive authority suggests that "custody" includes the original legal status.**

Although the Court finds that the plain text and surrounding context strongly suggests a return to custody, including the legal status that authorized such custody, several courts have come to competing conclusions. Given that district courts around the country have come to different conclusions on this matter, the term "custody" is likely "reasonably susceptible to more than one interpretation." *Koerber*, 10 F.4th at 1112; *see also Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001) (explaining that ambiguous language is "capable of being understood in two or more possible senses or ways" (quoting Webster's Ninth New Collegiate Dictionary 77 (1985)). In light of any remaining ambiguity, the Court "must turn to other sources to find its meaning." *S. Utah Wilderness All. v. Off. of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1237–38 (10th Cir. 2010).

Courts "may not defer to an agency interpretation of the law." *Adams v. FAA*, 168 F.4th 1271, 1278 (10th Cir. 2026) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024)). "Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch." *Loper Bright*, 603 U.S. at 403. A "judgment of the Executive Branch may help inform [the] inquiry," but an agency's expertise only provides the "power to persuade," rather than any "power to control." *Id.* at 413 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Under *Skidmore*, the power of persuasion "var[ies] with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Carpio v. Holder*, 592 F.3d 1091, 1098 (10th Cir. 2010) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)).

Several regulations indicate that "custody," as used in § 1182(d)(5)(A), includes the legal status authorizing such custody. 8 C.F.R. § 212.5(e), titled "Termination of parole," provides that

13

upon expiration or termination of parole, the noncitizen "shall be restored to the status that he or she had at the time of parole." 8 C.F.R. § 212.5(e)(1)–(2) (2026). This regulation uses the same mandatory language followed by "restored," which mirrors "return," and uses the word "status" in place of "custody." This substitution of the word "status" for "custody" has been present in the regulation for at least forty-five years. *See* Termination of Parole, 46 Fed. Reg. 24929-01, 1981 WL 120031, at *24930 (May 4, 1981) (noting that upon termination of parole, "he or she shall be restored to the status which he or she had at the time of parole"). When Congress enacted IIRIRA and left the phrase "the alien shall forthwith return or be returned to the custody from which he was paroled" unaltered, it did not do so in a vacuum. "When Congress used the material same language in [the statute], it presumptively was aware of the longstanding [administrative] interpretation of the phrase and intended for it to retain its established meaning." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 722 (2018) (citations omitted); *see also Bragdon v. Abbot*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."). Thus, the Court presumes Congress was aware that the agency had been interpreting the phrase "return to the custody" to mean "restored to the status that he or she had at the time of parole." As such, the Court finds that this presumption supports the reading that "custody" includes the legal status that authorized such custody.

8 C.F.R. § 1.2 (2026) further clarifies the statutory phrase, "parole of such alien shall not be regarded as an admission of the alien." § 1182(d)(5)(A). 8 C.F.R. § 1.2 defines an "[a]rriving alien]" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry." This definition demonstrates that a noncitizen "attempting to come into the United

14

States" is an "applicant for admission," and thus, continuing to treat a noncitizen's case as any other "applicant for admission" does not necessarily mean as someone physically present within the United States. 8 C.F.R. § 1.2 goes a step further and explains that an "arriving alien," also known as "an applicant for admission coming or attempting to come into the United States at a port-of-entry," remains an "'arriving alien' even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked." This suggests that parole pursuant to § 1182(d)(5)(A) has not been interpreted to change the noncitizen's legal status. Further, this regulation is consistent and aligns with § 1182(d)(5)(A)'s requirements that (1) "the alien shall forthwith return or be returned to the custody from which he was paroled," and (2) "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." In other words, the regulation suggests that: (1) after the noncitizen is returned to custody, including the legal status authorizing such custody, from which she was paroled; and (2) the noncitizen's case is dealt as if she were any other applicant for admission without parole.

This regulatory authority recently provided support for an agency decision, *Matter of Q. Li*, that interpreted the phrase "the alien shall forthwith return or be returned to the custody from which he was paroled" to require that "an alien detained under section 235(b) who is released from detention pursuant to a grant of parole under section 212(d)(5)(A), and whose grant of parole is subsequently terminated, is returned to the custody under section 235(b)." 29 I. & N. Dec. 66, 69 (B.I.A. 2025). Citing 8 C.F.R. § 212.5(e)(2)(i), the decision specifically notes that when the parole is terminated the noncitizen "shall be restored to the status that he or she had at the time of parole." *Id.* at 69–70. Not only does this interpretation align with the relevant regulation's use of the word "status," but it aligns with the plain meaning of the word, "custody." Because "custody," as used

15

in § 1182(d)(5)(A), possibly encompasses "physical custody," "detention," or the "mere power, legal or physical, of imprisoning or of taking manual possession," including the initial legal status avoids reading out the initial legal power that authorized the "custody."

Given the agency's expertise in immigration matters, the consistency between regulations and consistency over time, and persuasiveness of the position, the Court considers these regulations and their power to persuade as to the inquiry of whether "custody," as used in § 1182(d)(5)(A), includes the legal status that authorized such custody.

In sum, the Court finds that the plain text of § 1182(d)(5)(A) requires that Petitioner be returned to the "custody," including the status that authorized such custody, upon the expiration of parole. In the event that some statutory ambiguity remains, the Court finds that the relevant agency authority persuasively indicates that "custody" includes the initial legal status.

## II.     The entry fiction doctrine applies to parolees under § 1182(d)(5)(A) and resolves any ambiguity about the meaning of "custody."

In addition to the statutory text and surrounding context suggesting that "custody" includes the legal status authorizing such custody, application of the entry fiction doctrine demonstrates that this is the correct interpretation of the statute. Application of the entry fiction to § 1182(d)(5)(A) parole resolves any ambiguity about whether "custody" includes one's legal status. Case law and the interpretations of phrases consistently used throughout pre- and post-IIRIRA versions of § 1182(d)(5) parole, demonstrate that Congress intended that the entry fiction be applied to noncitizens paroled under § 1182(d)(5)(A).

The entry fiction doctrine, a legal fiction, creates a distinction between a noncitizen who has "effected an entry" into the United States and a noncitizen who arrives at a port of entry or is detained shortly after unlawful entry. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020). The entry fiction creates a distinction in which noncitizens "who arrive at ports of

entry" or are "detained shortly after unlawful entry" are "'treated' for due process purposes 'as if stopped at the border,'" even if they were "paroled elsewhere in the country for years pending removal." *Id.* (citations omitted). The Tenth Circuit has recognized this doctrine in the parole context. *See Sierra v. INS*, 258 F.3d 1213, 1218 (10th Cir. 2001) ("Although [the noncitizen parolee] has been physically present in the United States for more than twenty years, [he] is 'legally considered to be detained at the border and hence as never having effected entry into this country.'" (citing *Gisbert v. U.S. Att'y Gen.*, 988 F.2d 1437, 1440 (5th Cir. 1993), *amended by* 997 F.2d 1122 (5th Cir. 1993)). When a noncitizen is considered detained at the border, then "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Id.* (citing *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)).

Underlying the entry fiction doctrine are the "fundamental propositions" that "'[t]he power to admit or exclude aliens is a sovereign prerogative,'" *see Thuraissigiam*, 591 U.S. at 139 (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)), "the Constitution gives 'the political department of the government' plenary authority to decide which aliens to admit," *id.* (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892)), and accompanying "that power is the power to set the procedures to be followed in determining whether an alien should be admitted," *id.* (citing *Knauff*, 338 U.S. at 544).

Applying the entry fiction to § 1182(d)(5)(A) parole resolves any ambiguity about the meaning of "custody." Several courts contend that finding § 1182(d)(5)(A) to require "the petitioner's status" to revert back to "what it was when he was initially in custody" to be "illogical" given that § 1182(d)(5)(A) "recognizes that the parole physically happened." *Rafibaev*, 2026 WL 607559, at *4 (quoting *Coal. for Humane Immigrant Rights*, 805 F. Supp. 3d at 86). Even if the Court assumes that § 1182(d)(5)(A) acknowledges that the parole "physically happened," that

17

recognition does not prohibit the parolee's return to the legal status they had when they were paroled. But acknowledging that the parole physically happened while maintaining that the return to custody includes the parolee's previous legal status is hardly illogical when applying the entry fiction. In fact, reconciling contradictory physical and legal realities is largely the function of the entry fiction doctrine. The Tenth Circuit has found that a noncitizen parolee who had "been physically present in the United States for more than twenty years" was "legally considered to be detained at the border and hence as never having effected entry into this country." *Sierra*, 258 F.3d at 1218 (citation omitted). The Court's decision in *Sierra* indicates that a parolee under § 1182(d)(5)(A) returns to the custody—and legal status authorizing such custody—upon the expiration of parole.

Notably, the courts that have found "custody" to not include the accompanying legal status have not addressed the entry fiction doctrine sufficiently or at all. *Rafibaev* does not mention *Sierra* and only alludes to the entry fiction. *See* 2026 WL 607559, at *3 n.6. Similarly, *Qasemi* does not mention the entry fiction doctrine. *See* 2025 WL 3654098, at *1. *Coalition for Humane Immigrant Rights* mentions the entry fiction once and concludes that the statute does not require a parolee's return to the "position of an applicant for admission standing at the threshold of entry" and that the legal status refers to "applicant for admission." *See* 805 F. Supp. 3d at 85. The *Coalition* court determines that § 1182(d)(5)(A) does not "prove that the law treats the parole as if it never happened." *Id.* However, this conclusion does not align with how case law has interpreted the relationship between parole and the entry fiction before and after IIRIRA.

**A. Case law supports application of the entry fiction.**

Case law indicates that previous versions of 8 U.S.C. § 1182(d)(5)(A) have been interpreted to include application of the entry fiction doctrine when a noncitizen is paroled

pursuant to the statute. Application of the entry fiction resolves any ambiguity and perceived illogicality resulting from the meaning "custody" as used in § 1182(d)(5)(A).

The historical difference between exclusion and expulsion, or deportation, proceedings reveals volumes about the meaning of "custody" in § 1182(d)(5)(A). Prior to the 1996 enactment of IIRIRA and consolidation to "removal proceedings," there were deportation proceedings and exclusion proceedings. *See Judulang v. Holder*, 565 U.S. 42, 45 (2011). Deportation proceedings, also referred to as expulsion proceedings, took place pursuant to Chapter Five of the INA and applied to "an alien already physically in the United States." *Landon*, 459 U.S. at 25. Exclusion proceedings took place pursuant to Chapter Four of the INA and applied to "an alien outside the United States seeking admission." *Id.*

Contrast the pre-IIRIRA statutory framework with the framework at issue: §§ 1225 and 1226. The United States is authorized to detain "certain aliens seeking admission into the country" under § 1225, and it is authorized to detain others "already in the country" under § 1226. *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1061 (7th Cir. 2025) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018)). Considering prior views of the effect of § 1182(d)(5) parole on a noncitizen's legal status compared to their physical reality within the United States demonstrates that the entry fiction should be applied to parole pursuant to § 1182(d)(5)(A). Therefore, in light of the entry fiction, the term "custody" should be interpreted to include the noncitizen's legal status from which they were paroled.

Several circuits have considered application of the entry fiction to pre- and post-IIRIRA versions of § 1182(d)(5), and parole generally, and have determined that the parolee is not deemed to be within the United States.

In *Sierra*, the Tenth Circuit deployed the entry fiction to parole under the Mariel Cuban regulations.[3] 258 F.3d at 1218. Notably, in support of the proposition that the noncitizen parolee was "legally considered to be detained at the border and hence as never having effected entry into this country," the court cited *Gisbert*, 988 F.2d at 1440, *amended by* 997 F.2d 1122, which dealt with a pre-IIRIRA version of § 1182(d)(5)(A) and generally acknowledged that aliens may be physically allowed in the United States while remaining legally considered "detained at the border." *Id.* Citing this application of the entry fiction to support applying the entry fiction to parole under the Mariel Cuban regulations indicates a broad, rather than narrow, application of the entry fiction doctrine in parole cases. Thus, it can be inferred from *Sierra* that the Tenth Circuit would recognize that the entry fiction doctrine applies to parole under a post-IIRIRA version of § 1182(d)(5)(A).

The Ninth Circuit, considering the same language at issue under § 1182(d)(5), found "[i]t is clear from the [language of § 1182(d)(5)] that appellant's parole into the United States did not constitute an 'entry' into the United States within the meaning of the Immigration and Nationality Act, so as to make him eligible for expulsion rather than exclusion proceedings." *Siu Fung Luk v. Rosenberg*, 409 F.2d 555, 558 (9th Cir. 1969). The Ninth Circuit considered the phrases at issue here. *See id.* At the time, the term "entry" meant "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise." 8

---

[3] The Court notes that *Sierra* dealt with a petitioner who had been physically in the United States for over twenty years and alleged a violation of due process. 258 F.3d at 1218–19. However, the court applied the entry fiction and explained that the petitioner was only entitled to the procedures authorized by Congress because he was considered "detained at the border." *Id.* at 1218. Even though the petitioner only brought a due process claim, the application of the entry fiction is highly pertinent to the Court's analysis because *Sierra* recognizes a parolee is "legally considered to be detained at the border" while physically within the country. Thus, the parolee's physical presence does not confer any additional rights beyond those prescribed by Congress and granted under the Executive's authority.

U.S.C § 1101(a)(13) (1952); § 1101(a)(13) (1958). "Entry" plainly referred to "any coming of an alien into the United States," and to find that parole does not constitute an "entry" is to find that the parolee had not made "any coming . . . into the United States" despite their physical presence. Thus, the finding that parole did not make a noncitizen eligible for expulsion proceedings, which applied to a noncitizen physically within the country, reflects application of the entry fiction. Four years later, the Ninth Circuit, considering noncitizens' statuses after § 1182(d)(5) parole, affirmed that noncitizens paroled pursuant to § 1182(d)(5) are legally treated as if they are on the threshold of initial entry. *Yuen Sang Low v. Att'y Gen. of U.S.*, 479 F.2d 820, 823 (9th Cir. 1973) ("We are regretfully constrained to hold that suspension of deportation under section 244(a) is not a right or privilege extended to those paroled into the United States and who are therefore legally merely on the threshold of initial entry."). Again, the Ninth Circuit recognized a distinction between the parolee's legal status and physical reality.

The Second Circuit has noted that, a "'parolee,' even though physically in the country, is not regarded as having 'entered' and thus has not acquired the full protection of the Constitution. If he is required to leave the United States, he is being excluded, not expelled." *U.S. ex rel. Kordic v. Esperdy*, 386 F.2d 232, 235 (2d Cir. 1967). Recognizing that the parolee would be "excluded, not expelled" is crucial to interpreting the effect of § 1182(d)(5) parole. The court acknowledged that the parolee is physically within the country but nonetheless interpreted their legal status to require exclusion which Congress reserved for noncitizens who were "outside the United States seeking admission." *Id.*; *see also Landon*, 459 U.S. at 25. In considering why the entry fiction applies to § 1182(d)(5) parole and not a conditional landing permit under 8 U.S.C. § 1282, the court reasoned "the fiction that the alien is still under detention 'at the boundary line,' *Kaplan v. Tod*, 267 U.S. 228, 230 (1925), is better served by the device of 'parole'" because § 1182(d)(5)

21

"explicitly provides that it 'shall not be regarded as an admission of the alien,' and 8 U.S.C. § 1282 is silent on the subject." The Second Circuit affirmed the application of the entry fiction to a post-IIRIRA version of § 1182(d)(5)(A) in *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2007).[4] In *Ibragimov*, the Second Circuit found that "the terms of [§ 1182(d)(5)(A)] reflect the well-settled principle that Congress did not intend for parole of an alien to constitute an alien's legal entry or admission to the United States." *Id.* (citing *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958)). This reasoning indicates that the entry fiction applies to § 1182(d)(5) parole and the "custody from which he was paroled" includes a noncitizen's initial legal status.

The Fifth Circuit has also recognized that post-IIRIRA § 1182(d)(5)(A) "parole creates something of legal fiction; although a paroled alien is physically allowed to enter the country, the legal status of the alien is the same as if he or she were still being held at the border." *Duarte v. Mayorkas*, 27 F.4th 1044, 1058 (5th Cir. 2022). The Fifth Circuit also recognized the entry fiction's application pre-IIRIRA parole. *See Delgado-Carrera v. INS*, 773 F.2d 629, 632 (5th Cir. 1985) ("A paroled alien is, therefore, not deemed to be within the United States and is subject to exclusion just as if he were initially appearing at the border seeking entry.").

Not only have several circuits interpreted the entry fiction to apply to pre- and post-IIRIRA parole, but the Supreme Court has interpreted the pre-IIRIRA phrases, "shall not be regarded as an admission of the alien," and "shall continue to be dealt with in the same manner as that of any

---

[4] The Court notes that, while *Ibragimov* was decided before *Loper Bright*, *Ibragimov* did not simply defer to agency regulations under the *Chevron* doctrine. *See* 476 F.3d at 134–35. *Ibragimov* plainly stated that the "terms of this statute [§ 1182(d)(5)(A)] reflect the well-settled principle that Congress did not intend for parole of an alien to constitute an alien's legal entry or admission." *Id.* at 134. The court found "no reason why the *statute's provision* stating that 'parole of [an] alien shall not be regarded as an admission,' . . . should not be read to apply here." *Id.* (emphases added). Rather, the court conducted *Chevron* analysis, in a footnote, to address a possible "implicitly raise[d]" argument by the petitioner. *Id.* at 137 n.17. Thus, *Ibragimov* should be read as relying on the "terms of [§ 1182(d)(5)(A)]" rather than solely deferring to an agency regulation.

22

other applicant for admission to the United States," to mean the noncitizen parole was not "legally 'within the United States.'" *Leng May Ma*, 357 U.S. at 188–90 (1958); *see also Rogers v. Quan*, 357 U.S. 193, 196 (1958).

These applications of the entry fiction indicate that the phrases "such parole of such alien shall not be regarded as an admission of the alien," "return or be returned to the custody from which he was paroled," and "shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States" require that the noncitizen's legal status return to the status she had when she was detained at the border, if that was the "custody from which [s]he was paroled." This reading is the most consistent with how courts have applied the entry fiction across various renditions of parole statutes, including the current § 1182(d)(5)(A). The phrases, "such parole of such alien shall not be regarded as an admission of the alien," "the alien shall forthwith return or be returned to the custody from which he was paroled," and "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States," were present in the pre-IIRIRA versions. 8 U.S.C. § 1182(d)(5) (1952); 8 U.S.C. § 1182(d)(5) (1964); 8 U.S.C. § 1182(d)(5) (1982); 8 U.S.C. § 1182(d)(5) (1988). The courts that applied the entry fiction to § 1182(d)(5) parole focused on these phrases, not the phrases altered by IIRIRA. The IIRIRA change in 1996 substituted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" for "for emergent reasons or for reasons deemed strictly in the public interest." Pub. L. 104–208, 110 Stat. 3009 (1996). The fact that Congress did not change any of the phrases that warrant applying the entry fiction is significant because "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S 575, 580 (1978). Therefore, the fact that IIRIRA did not change any of the phrases

23

relied upon by courts, including the Supreme Court, to apply the entry fiction indicates that Congress intended the fiction to continue to be applied.

Accordingly, in light of the longstanding practice of applying the entry fiction to parole authorized by pre- and post-IIRIRA versions of § 1182(d)(5), the Court finds that the strongest reading of § 1182(d)(5)(A) is to require the return to "custody," including the original legal status authorizing such custody, from which Petitioner was paroled.

### B. Agency decisions and regulations support application of the entry fiction.

History and regulatory support indicate that a noncitizen's legal status reverts to that status which authorized the initial custody from which she was released. After *Loper Bright*, the Court's task is to independently evaluate the statute, while giving agency interpretations "due respect," but not binding deference. 603 U.S. at 403. Given that the statute and the surrounding context do not definitively indicate that the entry fiction applies to § 1182(d)(5)(A), the Court considers relevant regulations and BIA authority to the extent that they possess the power to persuade. *See id.* at 370 ("'The weight of such a judgment in a particular case,' the Court observed, would 'depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" (quoting *Skidmore*, 323 U.S. at 140)); *see also Lopez v. Garland*, 116 F.4th 1032, 1039 (9th Cir. 2024) ("As the Supreme Court explained in *Skidmore*, agency decisions 'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'") (citing *Skidmore*, 323 U.S. at 140)).

The BIA decision *Matter of B* plainly states that the "effect and presumably the purpose of the action of the Immigration and Naturalization Service in paroling the appellant and in holding

24

his appeal until after the termination of the criminal prosecution was to assign to the appellant the fictional status of a parolee, that is, a person who though physically within the United States is legally outside its gates." 2 I. & N. Dec. 172, 175 (B.I.A. 1944). This understanding of the effect of parole under § 1182(d)(5)(A) was applied by a district court which noted that parole under § 212(d)(5) "specifically provides that parole bestows no additional rights on the alien, nor does it in anywise change the alien's status" because it states that "when the purposes of such parole shall . . . have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Klapholz v. Esperdy*, 201 F. Supp. 294, 299 (S.D.N.Y. 1961) (internal quotations omitted), *aff'd*, 302 F.2d 928 (2d Cir. 1962).

The BIA affirmed this view of the effect of parole in *Matter of Dabiran*, 13. I. & N. Dec. 587, 589–91 (B.I.A. 1970). In *Matter of Dabiran*, the BIA held that because the "applicant's parole alone does not constitute an 'entry,' the fact that there was no immediate action with regard to his continued inspection because of his escape from custody and the assumption of another identity does not alter his status to that of an illegal entrant." *Id.* at 591. The BIA interpreted the phrase "returned to the custody from which he was paroled" to include the original legal status, and thus exclusion proceedings rather than expulsion proceedings were appropriate because the noncitizen returned to his original status of a noncitizen outside the United States seeking admission. *See id.* at 590–91.

The preamble to a 1981 amendment to 8 C.F.R. § 212.5 explains the agency's expectation that parole functions as preserving a noncitizen parolee's legal status as separate from their physical reality. Termination of Parole, 46 Fed. Reg. 24929-01, (May 4, 1981) 1981 WL 120031, at *24929. In response to the issue that "[u]pon revocation of parole the alien should be processed

25

in deportation rather than exclusion proceedings," the INS explained its position that "[a]lthough exclusion of an alien who is in reality firmly within the United States may be paradoxical, there is no doubt that Congress intended this by the specific and unequivocal language used in section 212(d)(5)." *Id.* The "specific and unequivocal language" the agency relied upon contains the same phrases relied upon by prior courts interpreting pre-IIRIRA versions of § 212(d)(5) such as: (1) "such parole of such alien shall not be regarded as an admission of the alien"; (2) "the alien shall forthwith return or be returned to the custody from which he was paroled"; and (3) "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* The agency specifically explained that a "distinction must be drawn between the physical presence of the alien in the United States on one hand, and the legal posture on the other which is mandated by statute." *Id.*

8 C.F.R § 1.2 (2026), which defines an "arriving alien," states that "[a]n arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked." This definition indicates that the agency interprets § 1182(d)(5)(A) parole to not change the legal status of the parolee regardless of their physical entry within the United States. Such a conception of parole is consistent with past Supreme Court, circuit, and other agency decisions' views of parole and its function.

Again, "[w]hen administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well." *Bragdon*, 524 U.S. at 645. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard*, 434 U.S. at 580. The agency has long interpreted the relevant phrases in the pre- and post-IIRIRA

26

parole statutes to indicate that the parolee's legal status remains as if they are at the border. Congress had the opportunity to change these phrases to address the administrative and judicial interpretations that found this language to imply that the entry fiction applied, but it chose to leave the phrases as they were when it enacted the IIRIRA amendments in 1996.

Under *Skidmore*, the agency decisions and regulatory guidance demonstrate thorough consideration of the text and Supreme Court decisions that consider the same phrases in the parole statute. *See Matter of Dabiran*, 13 I. & N. Dec. at 589–90. Further, these agency decisions have consistently viewed parole as a mechanism that allows physical entry of a noncitizen while legally treating them as if they are detained at the border. *See id.*; *Matter of B*, 2 I. & N. Dec. at 175; Termination of Parole, 46 Fed. Reg. 24929-01 (May 4, 1981) 1981 WL 120031, at \*24929; 8 C.F.R. § 1.2 (2026). The persuasive authority establishes that the agency has long treated parole as a mechanism that allows a noncitizen parolee to physically enter the United States without having effected an "entry," under previous versions of the INA, and now "admission." *See Matter of Dabiran*, 13 I. & N. Dec. at 589–90. The agency's interpretations do not conflict with existing case law or contradict the plain text of the statute.

Accordingly, to the extent that case law does not demonstrate that § 1182(d)(5)(A) requires the return to the "custody," including legal status authorizing such custody, under *Skidmore*, the Court finds agency decisions and regulations persuasive and informative as to the correct interpretation of § 1182(d)(5)(A).

**C.  Broader principles support application of the entry fiction.**

Separation of powers principles and the very function of utilizing a legal fiction such as the entry fiction support applying the fiction here.

The Supreme Court has long recognized that admitting and excluding noncitizens is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *see also Trump v. Hawaii*, 585 U.S. 667, 702 (2018); *Nishimura Ekiu*, 142 U.S. at 660 ("[T]he decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law."). The Executive's decisions here involve "'classifications . . . defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump*, 585 U.S. at 702 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). Given the Executive's choice to parole or not parole a noncitizen and its longstanding expectation that parole does not render the parolee's legal status as "within the United States," courts should observe the general principle that "such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Id.* Further, considering Congress's choice to not use IIRIRA to address the longstanding judicial interpretations of the phrases, "shall not be regarded as an admission of the alien," and "shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States," *Leng May Ma*, 357 U.S. at 188–90; *see also Rogers*, 357 U.S. at 196, courts should not displace congressional intent by avoiding application of the entry fiction. *See Landon*, 459 U.S. at 34–35 ("The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy."). Therefore, finding that § 1182(d)(5)(A) "does not require Petitioner to be detained under the same statutory status as his original detention," *see Rafibaev*, 2026 WL 607559, at *4, does not warrant disturbing the policy choices of Congress and the Executive.

28

Finally, applying the entry fiction doctrine here is coherent with the very purpose of legal fictions in general. The point of a legal fiction is to "prevent injustice." *Union Refrigerator Transit Co. v. Commonwealth of Kentucky*, 199 U.S. 194, 208 (1905). The plain text of § 1182(d)(5)(A) provides that the "Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." Parole is entirely discretionary and "is simply a device through which needless confinement is avoided while administrative proceedings are conducted." *Leng May Ma*, 357 U.S. at 190. Given the longstanding interpretation that parole is not intended to affect the parolee's legal status, to interpret otherwise would undermine the intent of Congress and the Executive's intent in paroling the noncitizen. In other words, such an interpretation would inflict the very injustice the entry fiction is meant to prevent.

At least one court has disregarded the entry fiction because, in its view, "[p]retending that Petitioner never entered the United States not only subordinates fact to fiction, it disregards the plain meaning of the Due Process Clause, which promises its protection to every 'person' within the United States." *Rincon v. Hyde*, 810 F. Supp. 3d 101, 112 (D. Mass. 2025). The entry fiction does not disregard the plain meaning of the Due Process Clause. Since, under the fiction, a noncitizen is "legally considered to be detained at the border," "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Sierra*, 258 F.3d at 1218. Here, the procedure at issue is § 1182(d)(5)(A) and the procedure requires the noncitizen's return to the "custody," including the accompanying legal status, from which she was paroled. Thus, finding that a parolee under § 1182(d)(5)(A) returns to the same custody and status does not disregard the Due Process Clause, rather it is the process a paroled noncitizen is due.

Further, *Rincon* reasoned that applying the fiction "effectively withdraws" a noncitizen parolee's constitutional rights, and amounts to an "eras[ure]" of the noncitizen's rights and presence in the country. *Id.* Not so. Application of the fiction is entirely consistent with recognizing that expiration of § 1182(d)(5)(A) parole requires that the parolee be returned to the "custody," including the legal status from which she was paroled. The fiction is that parole allows for a noncitizen's physical presence while withholding the accompanying legal status. *See Sierra*, 258 F.3d at 1218 ("Although [the noncitizen parolee] has been physically present in the United States for more than twenty years, [he] is legally considered to be detained at the border."). The fiction "withdraws" and "erases" nothing because the rights associated with physical presence are not conferred by way of parole.

Accordingly, the Court finds that § 1182(d)(5)(A) requires a noncitizen parolee to be returned to the "custody," including the accompanying legal status, from which they were paroled.

## III.    Petitioner is detained pursuant to § 1225(b).

Here, it is undisputed that "Petitioner was paroled into the United States on or about December 15, 2022 pursuant to INA § 212(d)(5), and [she] was released with an I-94 as an alternative to detention." Doc. 14; *see also* Doc. 14-1. Her parole expired on February 12, 2023. *See* Doc. 1-3 at 31. Given the Court's statutory analysis and finding that § 1182(d)(5)(A) requires the return to "custody," along with the accompanying legal status, from which Petitioner was paroled, the Court finds that Petitioner was returned to "custody" under § 1225(b) upon the expiration of her parole.

Petitioner argues that immediate release is warranted because her due process rights have been violated as Respondents have not established lawful revocation of parole. Doc. 1 ¶¶ 49–54; *see also* Doc. 11 at 1–2. Petitioner argues that Respondents have articulated no changes in

30

circumstance or an "individualized basis for justifying revocation of parole." Doc. 1 ¶ 53. The

Court need not opine on whether an "individualized basis" is needed to justify the revocation of

§ 1182(d)(5)(A) parole given that Petitioner's parole expired—no revocation took place. *See* Doc.

1-3 at 31.

Petitioner argues that there is a "significant" discrepancy in DHS's own records given that

DHS paroled Petitioner into the United States in 2022, but the Notice to Appear issued in 2025

charges her as a noncitizen present in the United States "without being admitted or paroled."[5] Doc.

14 at 2. She also contends that her release on parole created a protected liberty interest. Doc. 14-1

at 3. Petitioner raises both of these issues in response to the Court's order to provide supplemental

briefing on the issue of whether Petitioner's parole expired or was revoked. *See* Doc. 14. She does

not move to amend her Petition to include these arguments. Thus, these arguments are not properly

before the Court. *See Lawmaster v. Ward*, 125 F.3d 1341, 1346 n.2 (10th Cir. 1997) (refusing to

consider a claim against the United States not raised in the original complaint); *see also Parker v.

Scott*, 394 F.3d 1302, 1319–20 (10th Cir. 2005) ("We do not review these claims because

---

[5] To the extent that Petitioner asserts this to argue that the delay between her parole expiration and detention affects her status, § 1182(d)(5)(A) is unambiguous on this point. Section 1182(d)(5)(A) provides that "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." The phrase "shall forthwith return or be returned" renders the return mandatory and immediate upon her parole's expiration. *Bozeman*, 533 U.S. at 153 ("[T]he word 'shall' is ordinarily 'the language of command.'"); *see also Forthwith*, *Black's Law Dictionary* (6th ed. 1990) (defining "forthwith" as "Immediately; without delay; directly; within a reasonable time under the circumstances of the case; promptly and with reasonable dispatch"). This interpretation of the plain text is supported by case law considering pre-IIRIRA parole. *See Rogers*, 357 U.S. at 195 ("We doubt that the Congress intended the mere fact of delay to improve an alien's status from that of one seeking admission to that of one legally considered within the United States."); *Siu Fung Luk*, 409 F.2d at 558 (rejecting an argument that INS's lack of immediate action after a parole revocation effected an entry). Petitioner's parole expired in 2023. *See* Doc. 13-1 (Form I-94); Doc. 1-3 at 31 (Form I-589). Thus, any delay in physically detaining Petitioner following the expiration of her parole should not be construed as altering her legal status from § 1225(b) to § 1226(a) since she, legally, is immediately "returned" to the border upon expiration of her parole.

[Petitioner] failed to assert them in his district court petition for habeas relief."). Thus, the Court will not consider Petitioner's arguments that are not properly before the Court.

## CONCLUSION

In sum, the Court finds that the term "custody" includes the accompanying legal status—the statutory authority—that authorized the initial custody from which the noncitizen was paroled. Given this finding, Petitioner is detained pursuant to § 1225(b) and not entitled to a bond hearing pursuant to § 1226(a). Accordingly, Petitioner has received the process she is due under the Due Process Clause.

**IT IS THEREFORE ORDERED** that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1) and Motion for Temporary Restraining Order (Doc. 5) are hereby **DENIED** for reasons described in this Memorandum Opinion and Order.

_____/S/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE

32